UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GEORGE SAIEG,

|  |  |
|---|---|
| Plaintiff, | Civil Action No. |
|  | 09-CV-12321 |
| vs. |  |
|  | PAUL D. BORMAN |
| CITY OF DEARBORN and CHIEF OF | UNITED STATES DISTRICT JUDGE |
| POLICE RONALD HADDAD, |  |
|  |  |
| Defendants. |  |

_____/

## OPINION AND ORDER (1) DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, (2) DENYING PLAINTIFF'S REQUEST FOR INJUNCTIVE RELIEF, and (3) GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### I.  INTRODUCTION

This case is brought under the First and Fourteenth Amendments to the United States Constitution.  Plaintiff George Saieg is the founder and former director of Arab Christian Perspective ("ACP"), a national ministry established for the purpose of proclaiming the Gospel of Jesus Christ to Muslims.[1]  Defendants are the City of Dearborn ("Dearborn" or "the City") and its Police Chief, Ronald Haddad (collectively, "Defendants").[2]  Plaintiff seeks a declaration that his free speech rights were abridged when Defendants restricted the ability of Plaintiff and his associates to distribute religious literature while walking around last year's annual Arab International Festival

_____

[1] ACP and George Saieg were the original plaintiffs in this case.  ACP was dissolved in 2009, but Plaintiff and his associates continue their Christian ministry of evangelizing Muslims.  On January 15, 2010, ACP was voluntarily dismissed from this action, *see* docket entry 25, leaving only Saieg as a party plaintiff.

[2] Haddad is sued in his official capacity only.

1

(the "Festival"), which is an outdoor event organized by a private organization and held every summer in Dearborn, Michigan.  Plaintiff also seeks injunctive relief preventing Defendants from imposing the same restrictions on his speech at this year's Festival, which is scheduled for June 18-20, 2010.  Finally, Plaintiff seeks his reasonable attorney fees, costs, and expenses pursuant to 42 U.S.C. § 1988.[3]  Plaintiff does not seek monetary damages.

Plaintiff filed his Motion for Summary Judgment and Request for Injunctive Relief on March 15, 2010.  Defendants filed their Motion for Summary Judgment on April 9, 2010.  After the parties completed their briefing, but before oral argument, the Court issued an order requiring Defendants to "designate . . . where Plaintiff's booth/table would be located at th[e] [2010 Festival]."  *See* docket entry 55.  Defendants responded, stating that Plaintiff's booth/table would be located within the "Artesian Tent," which, according to the map attached to Defendants' submission, is centrally located within the inner perimeter.  *See* docket entry 56.  That tent has night lighting.  Counsel for Defendants stated at oral argument that Plaintiff would receive the tent location free of charge.

These cross-motions mark a continuation of the case filed last year by Plaintiff and his then-organization, ACP, seeking to enjoin Defendants from enforcing the anti-leafleting ban against Plaintiffs, who wanted to carry out their Christian missionary activities at the Festival, which was held on June 19-21, 2009.

The present action was filed on June 16, 2009.  The next day, on June 17, 2009—which was two days before the start of the 2009 Festival—Plaintiff filed an "Emergency Motion for Temporary Restraining Order" after learning that Defendants would not allow ACP members to distribute their

---

[3] Section 1988(b) authorizes a court, in its discretion, to award reasonable attorney's fees to the prevailing party in a civil rights case.

religious literature on the public sidewalks within the inner and outer perimeters of the Festival.

The next day, on June 18, 2009—the day before the start of the 2009 Festival—Presiding U.S. District Judge Nancy G. Edmunds held an evidentiary hearing on Plaintiff's emergency motion and denied injunctive relief.[4]  Ruling from the bench, Judge Edmunds stated:

> the question is really whether the restriction imposed by the organizers of the festival and enforced by the City of Dearborn are neutral with respect to content and are justified under the restriction of time – places on time, method and place.  And it seems to me that they clearly are.  They do not distinguish among the content of what's being distributed or promulgated, they are narrowly focused, they do provide an alternative means of access. It's not the method of access that the plaintiffs would choose if they could have their way on this, but it appears to support a legitimate government interest for crowd control and safety.

Def. Ex. P., p. 36.  Judge Edmunds also held that the United States Supreme Court's decision in *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640 (1981), and the Sixth Circuit's decision in *Spingola v. Village of Granville*, 39 F. App'x 978 (6th Cir. 2002) (unpublished), both cases upon which Defendants heavily rely, control here, precluding the relief sought by Plaintiff.

Plaintiff filed an Amended Complaint on July 7, 2009.  The Amended Complaint contains four counts.  The first count alleges a violation of Plaintiff's First Amendment right to freedom of speech.  The second count alleges a violation of Plaintiff's First Amendment right to association. The third count alleges a violation of Plaintiff's First Amendment right to freely exercise his religion.  Finally, the fourth count alleges a violation of Plaintiff's Fourteenth Amendment right to equal protection.  Although not the subject of an independent count in the Amended Complaint, Plaintiff also alleges municipal liability under 42 U.S.C. § 1983.

---

[4] A full transcript of the hearing is attached as Exhibit P to Defendants' motion.

Now before the Court is Plaintiff's Request for Injunctive Relief and the parties' cross-motions for summary judgment.  The matters have been fully briefed and the Court heard oral argument on May 21, 2010.  For the reasons that follow, Defendants' Motion for Summary Judgment will be granted; Plaintiff's Request for Injunctive Relief and Motion for Summary Judgment will be denied.

## II. BACKGROUND

### A.

Plaintiff, a Christian pastor with "a deeply-held religious conviction to evangelize non-Christians" and convert them to the Christian faith, is the founder and former director of ACP, a national ministry established for the purpose of proclaiming the Gospel of Jesus Christ to Muslims.[5] Saieg Aff. ¶¶ 1, 3; Saieg Dep. at 15-16.  As stated by Plaintiff,

> [a]s part of my Christian outreach efforts, I travel around the country with fellow Christians attending and distributing Christian literature at various festivals and mosques to exercise my religion and to follow my religious duty . . .

Saieg Aff. ¶ 4.  Plaintiff's religious materials, which are distributed free of charge to willing recipients, "do not contain solicitations" or "commercial speech" – only "religious messages."  *Id.* ¶ 5.

---

[5] ACP dissolved in 2009 but its mission remains important to Plaintiff and his associates:

> [i]n December 2009, the Board of Directors voted to dissolve ACP. Nonetheless, my fellow Christians and I will continue our public ministry to evangelize Muslims, including evangelizing Muslims in the City of Dearborn, Michigan . . . during the annual Dearborn Arab International Festival.

Saieg Aff. ¶ 6.  *See also* Saieg Dep. at 16.

4

**B.**

The Festival is organized and operated by the American Arab Chamber of Commerce ("AACC"), a private organization.  Beydoun Dep. at 14.  The purpose of the Festival is to "bring as many Metro Detroiters to the East Dearborn area," "promote the Warren Avenue Business District," and "build bridges from the Warren Avenue community to the Greater Metro Detroit area."  Def. Ex. E, p. 3.  Festival events include a carnival, main stage with live performers, children's tent, vendor and artisan tents, sidewalk sales, and multi-cultural food and entertainment. *Id*. at p. 1; Def. Ex. D (flyer and program).

Fay Beydoun is the current Executive Director of the AACC, a position that she has held since 2009.  Beydoun Dep. at 11-12.  As Executive Director of the AACC, Beydoun was the chief organizer of the 2009 Festival; she will also organize this year's Festival.  Plaintiff has not sued the AACC.

The Festival is held in an area that envelops public streets and sidewalks in Dearborn.  *See* Def. Ex. F (map).  Thus, street closures by the City are necessary to facilitate the Festival.  *See* Def. Ex. E (memo from the AACC to the Dearborn City Council listing street closure requests); Def. Ex. M (Dearborn City Council resolution approving the closure of streets); Def. Ex. I (memo regarding placement of barricades on roads).

"Core" Festival activities—including the main stage, the carnival, the children's tent, and the vendor and artesian tents—take place within what the parties call the "inner perimeter," which is defined by the following boundaries: western and eastern boundaries at Hartwell Street and Kingsley Street, respectively; northern and southern boundaries at the front of the businesses located on Warren Avenue, encompassing the sidewalks on Warren Avenue.  To the extent that core Festival

activities occur on Miller Road, the northern and southern boundaries extend one block beyond the Warren Avenue businesses.  *See* Def. Ex. M (Dearborn City Council resolution listing Festival boundaries).  *See also* Beydoun Dep. at 41-42 (discussing Festival boundaries).

"Ancillary" activities take place in what the parties call the "outer perimeter," which is defined by the following boundaries: western and eastern boundaries at Schaefer Road and Wyoming Avenue, respectively; northern and southern boundaries at Morrow Circle and Blesser Avenue, respectively.  Defendants concede in their brief that "the outer perimeter [does] not include activities such as carnival rides or vendor booths," but rather "provid[es] a safe, controllable buffer between the bulk of the Festival activities and the outside world."  Def. Br. at 4-5.[6]  Also within the outer perimeter is parking for both Festival-related and non-Festival-related traffic:

> [parking in the outer perimeter] was for people that were going to the businesses [on or around Warren Avenue], not just [for people] coming to attend the festival, and it was also for some [Festival] vendors.

Beydoun Dep. at 43-44.

A map of the inner perimeter is attached as Exhibit D to Defendants' motion.  The main stage is located on the western edge of the inner perimeter; the carnival is located on the eastern edge of the inner perimeter.  A series of tents line the space in between – from west to east along Warren Avenue: food booths, sponsor booths, children's tent, and artisan tent containing forty booths.  *See* Def. Ex. D.  In total, the 2009 Festival featured fourteen food vending areas, seventeen sponsor areas, forty artisan booths, and twenty-five information tables, for a total of ninety-six booths or tables throughout the inner perimeter.  *See id.*  Beydoun anticipates that the inner perimeter will be

---

[6] The Festival organizers requested that this "buffer zone" be created  "between the open streets and the area where the core Festival activities were occurring" "[t]o ensure an orderly and safe transition from the open streets and the streets occupied by the Festival."  *Id.* at 3.

expanded at the upcoming 2010 Festival to accommodate additional sponsors and vendors.  Beydoun

Dep. at 54-55.

The Festival attracts hundreds of thousands of people.  Def. Ex. G (Dearborn Press & Guide

article).  More than 250,000 were expected to attend the 2009 Festival.  *Id.*

### C.

The Festival is organized by the AACC, not by the City.  However, as Defendants

acknowledge in their brief,

> any large-scale event that occurs within the City of Dearborn inevitably
> requires City services.  For example, the [AACC] cannot close the streets and
> sidewalks without the City's permission.  (Exhibit E.)  Police support is
> needed for crowd control, to maintain a perimeter around the event, and to
> ensure public safety. (Transcript of deposition of Ronald Haddad, p. 15, 18,
> attached as Exhibit K. [Hereinafter "Haddad dep."])  To facilitate this
> support, the Dearborn Police Department set up a command post within the
> Festival boundaries.  (Haddad dep., p. 52.)  Additionally, the City is
> responsible for maintaining the cleanliness of the streets and sidewalks.

Def. Br. at 5.  Moreover,

> [t]o ensure orderly planning, the City sends representatives to meetings of the
> Festival committee.  Five meetings took place for the 2009 Festival.
> (Mrowka dep., p. 8.)  City participants included Sgt. Jeffrey Mrowka and
> Deputy Recreation Director Eric Peterson. (Mrowka dep., p. 9.)  Mrowka is
> special events coordinator for the police department.  (Mrowka dep., p. 5.)
> Peterson is the special events coordinator for the recreation department.
> Mrowka and Peterson ensure that organizations hosting events in the City
> obtain necessary approvals, and they identify the steps that will need to be
> taken to maintain the public health, safety, and welfare during the event.

*Id.  See also* Beydoun Dep. at 21 (testifying that "[t]he City provides a lot of support for the festival

and . . . they're the key people that would help . . . facilitat[e] the festival and so forth, so [City

officials] were invited to the [AACC] meetings"); *id.* at 40 (testifying that City police officers are

physically present at the Festival to "ensure that sidewalks and traffic . . . [are] . . . maintained"); *id.*

at 77 (testifying that the AACC "coordinated with the police" in attempting to control handbilling). Dearborn's Chief of Police, Ronald Haddad, and its Mayor, both participated in the 2009 Festival opening ceremony.  Beydoun Dep. at 75.

The City granted permission to the AACC to conduct the 2009 Festival "subject to all applicable ordinances and the rules and regulations of the Police Department."  Def. Ex. M (Dearborn City Council Resolution 5-330-09).  Via the same resolution, the City Council also (1) authorized the road closures sought by the AACC, (2) authorized the use of certain City-owned lots for off-site Festival parking, and (3) authorized assistance from the Dearborn Police, Fire, Public Works, Building & Safety and Recreational Departments to "insure a safe[], healthy, fun and successful event."  *Id*.

### D.

As noted above, the Festival grounds include the sidewalk area along Warren Avenue.  Any existing business along Warren Avenue that wanted to set up a sidewalk sale on the sidewalk in front of their store was required to submit an application to the AACC and obtain an AACC-issued permit/certificate.[7]  Beydoun Dep. at 31-32.

---

[7] For Festivals prior to 2009, any Warren Avenue business that wanted to set up a sidewalk sale at the Festival was required to apply to the City for a permit and obtain a City-issued permit/certificate.  This changed beginning with the 2009 Festival:

> A:     [I]n the past [before 2009] the city had issued the sidewalk sales permits and then after that [the AACC] had a discussion [with the City] and it was agreed that the [AACC] would issue permits or certifications allowing [Warren Avenue businesses] to have things outside . . .

Beydoun Dep. at 31.  *See also id.* at 65.  According to Defendants, "this change in procedures caused the sidewalks to become subsumed within the Festival boundaries."  Def. Br. 7.

Non-Warren Avenue businesses, such as food vendors, artists, and private organizations such as ACP, were also allowed to participate in the 2009 Festival. Such businesses and organizations were required to submit a timely application to the AACC and pay a fee. As explained by Beydoun:

> Q: Now, the tables and vendors that wanted to set up along Warren Avenue, did you have a separate process for them?
>
> A: Yes.
>
> Q: Was there a fee for individuals to set up a vending table or a tent along Warren Avenue?
>
> A: We don't allow just anybody to come and set up, and they're not allowed to decide where they want to set up. We have specific areas for specific things.
>
> Q: If somebody wanted to do vending, wanted to sell food items but not be on the sidewalk but wanted to be on Warren Avenue, was there an application process that they would go through with [the AACC]?
>
> A: Yes.
>
> Q: Was there a fee associated with that?
>
> A: Yes.

Beydoun Dep. at 33.

The fee schedule applicable to non-Warren Avenue businesses/organizations wishing to participate in the Festival is attached as the last two pages to Defendants' Exhibit O. An organization wishing to distribute religious materials at the Festival would have to purchase an information table. Beydoun Dep. at 50. An information table costs $150 plus a $100 refundable deposit. *Id*. A sign costs an extra $55, if needed by the business/organization. *Id*.

Plaintiff has never sought an information table through the AACC: "I never asked for a booth and I don't want a booth." Saieg Dep. at 105. Plaintiff wants to freely roam the public sidewalks,

handing out religious literature, for the purpose of evangelizing Muslims; he does not want to distribute his materials from a fixed location.  In 2009, the AACC provided Plaintiff with a booth, free of charge.  This year, counsel for Defendants stated at the hearing on May 21, 2010, that the AACC would provide Plaintiff with a booth, free of charge, in the artisan tent, which is closer to the middle of the Festival than was last year's booth location next to the children's carnival.  Also, unlike last year's fixed location, this booth is equipped with lighting to facilitate nighttime activity.

### E.

The Festival rules, which are promulgated by the AACC, prohibit "solicitation . . . outside designated vendor areas."  Def. Ex. O, p. 3, ¶ 2.  The rules also prohibit "political solicitation."  *Id.* at p. 2.  Beydoun conceded in her deposition that ACP's activity, because it is not commercial in nature, would not fall under the definition of "solicitation."  Beydoun Dep. at 53-54.  ACP's activity also would clearly not constitute "political solicitation."  Thus, there does not appear to be any written rule, promulgated by the AACC, preventing the distribution of religious materials at the Festival.  Nonetheless, Beydoun testified that "handbilling along the sidewalks adjacent to the festival" is not allowed.  Beydoun Dep. at 35-36.  As stated by Beydoun, "[i]f you want to distribute, there is a specific place for you to distribute, which is at an information table."  *Id.* at 51-52.  Beydoun testified that the AACC was concerned about keeping the sidewalks clear for the benefit of both Festival-goers and non-Festival-goers alike: "[w]e wanted to make sure that the sidewalks were available . . . for the people attending the festival [and] [for the] people that were trying to get from one location to another to go to the businesses."  Beydoun Dep. at 37.  *See also id.* at 62 ("[t]he concerns were that we wanted to make sure that there was a clear path for people, for pedestrians to be able to walk and to get from one place to another").  Beydoun further testified that

> [ACP] wanted to hand out items and we have the information tables for them
> to do that.  That's how we control making sure that we have a safe
> environment by creating those information tables within the tents for them.

*Id*. at 54.

Beydoun testified that, during the 2009 Festival, she was aware that "city police officers were prohibiting individuals from distributing literature in [the] outer [perimeter]."  Beydoun Dep. at 55.  She expects that City police officers will again prohibit the distribution of literature in both the inner and outer perimeters during the upcoming 2010 Festival.  *Id*. at 56.  Beydoun testified regarding the potential problems that could arise if handbilling was allowed in the outer perimeter:

> Q:     [W]hat would be the pedestrian or traffic issues with . . . allowing
> individuals to distribute literature in that outer boundary area?
>
> A:     [I]f you allowed someone to distribute literature within [the] outer
> area, you might as well allow the other street vendors to set up tables
> and start selling things in that area, too.  That is the buffer between
> going in and out.  You got to maintain a security area.

*Id*. at 58.

Dearborn Police Chief Ronald Haddad also testified that his officers patrolled the sidewalks during the 2009 Festival to ensure that they remain clear and open.  Haddad Dep. at 17-18.  He further testified that handbilling on the sidewalks during the Festival "was not going to be permitted" because

> we have rules where everybody is going to be in an assigned booth or table
> or tent, and anything that would delay the passage of anyone that would have
> a free access to the sidewalk, anything that would occur there that wasn't part
> of the sanctioned festival, it was not going to be permitted.

*Id*. at 18.[8]  Moreover, Haddad and his officers "were going to make sure that we kept the sidewalks,

---

[8] Haddad has extensive experience in law enforcement and, specifically, in crowd control.  As he testified before Judge Edmunds:

knowing that it was going to be a very crowded situation, we were going to do our very best to keep the sidewalks flowing." *Id*. Dearborn police officers who observed an individual distributing literature of any kind would be expected to stop that activity from occurring. Haddad Dep. at 70, 76. Haddad testified that if the individual persisted despite a police warning to stop, the individual would be subject to possible arrest. *Id*. at 72.

With regard to handbilling at the upcoming 2010 Festival, Haddad testified as follows:

> I'm going to recommend that no one be allowed to give out any kind of free material in a venue that swells up to a hundred thousand plus at any hour of the day and that hopefully will attract 300,000 people in the course of one weekend. I think it's a bad practice. I think that I'm not the only one that feels that way. You can go to the Michigan State Fair, they will not allow you to give out a paper clip unless you're stationary and at a booth. It just makes good sense, it's a good practice and it's not a standard that is applied indiscriminately, it's across the board.

*Id*. at 95.

---

> I'm in my 35th year of law enforcement. I spent 34 short years of my life in the City of Detroit. . . . I worked for Chrysler security over their fire and security at three major plants for nine months, and I've been the 18th police chief for the City of Dearborn since December 15th.
>
> * * * *
>
> I was assigned in charge of Detroit's east side, and that included the downtown area. Also, southwest Detroit was attached to it, and I had the occasion to be the commanding officer of the 11th Precinct for eight years during which time we did the Michigan State Fair for eight consecutive years. I was the task force commander there, as well. And the short answer is yes, I've been assigned many jobs for crowd control.
>
> * * * *
>
> And I was also in charge of Homeland Security for six years as an added responsibility for the City of Detroit, and I oversaw all major special events.

Def. Ex. P., pp. 18-19.

**F.**

Because Dearborn contains one of the largest Muslim populations in the United States, Plaintiff deems it "an important location for [his] Christian outreach efforts."  Saieg Aff. ¶ 8. Accordingly, Plaintiff has visited Dearborn during the Festival every year since 2004.  *Id.* ¶ 9.  The Festival has grown in size every year.  The ability of Plaintiff and his associates to freely roam the Festival grounds distributing their religious literature became circumscribed beginning at the 2009 Festival.  Plaintiff describes his experience at Festivals prior to 2009 as follows:

> 9.       For the five years prior to 2009 (2004-2008), I and other ACP members and volunteers visited the City during the Festival.  During each of these years, we freely roamed the public areas adjacent to and surrounding the Festival, including public sidewalks, handing out religious literature and discussing our Christian faith.

Saieg Aff. ¶ 9.  *See also* Saieg Dep. at 80 (explaining that at Festivals prior to 2009, Plaintiff and his associates conducted their outreach only on public sidewalks).

However, at the 2009 Festival, ACP members were not permitted to freely distribute their religious materials on the public sidewalks along Warren Avenue, as they had done in previous years.  See Saieg Aff. ¶¶ 12-13; Saieg Dep. at 70-71.

**G.**

Dearborn Police Sergeant Jeffrey Mrowka testified that the fixed location limitation applied equally to everyone wishing to distribute literature at the 2009 Festival:

> Q:       My understanding is you couldn't even distribute literature individually within the festival unless you were in your fixed location, that's right.
>
> A:       In a fixed location, that's right.
>
> Q:       So if individuals were away from their booths trying to distribute literature, either on the sidewalks or on Warren Avenue, that would

have been stopped; is that right?

A:   Yes.

Q:   So the only location then – and then you said the outer boundaries they weren't permitted to do the same thing, is that right, distribute the literature?

A:   Yes.

Q:   So the only place, then, in the City of Dearborn during the time this festival was going on that you could distribute the literature would be beyond those outer boundaries; is that right sir?

A:   In relationship to this festival, yes.

Mrowka Dep. at 32-33.

## H.

Plaintiff states that ACP members were unable to reach their intended audience from the eastern location.  According to Plaintiff, their tent/booth was not equipped with electricity and "[p]eople appeared unwilling to approach [their] location at night." *Id*. ¶ 36.  Additionally, because the eastern location was near the carnival, "the vast majority of people who came to this location were children." *Id*. ¶ 37.  As stated by Plaintiff, "[t]he ability to evangelize adult Muslims is made more difficult if Muslim children receive materials from Christians because the adult Muslims get angry if this happens." *Id*. *See also* Saieg Dep. at 74 (explaining that adult "Muslims get offended if you give gospel material to their children").

Plaintiff also complains that his 2009 tent/booth was far from the main stage area, which was on the western edge of the inner perimeter: "[t]he majority of the people attending the Festival congregated around the stage to listen to the free concert.  From our location, we were unable to reach these people with our materials." *Id*. ¶ 38.  As noted above, this year's tent/booth location is

14

closer to the main stage area, and not next to the children's rides, and provides electricity to facilitate

nighttime activity.

Plaintiff states that it is essential to his mission that he and his associates be permitted to

freely roam the sidewalks of the Festival handing out their religious materials:

> 39.    It is very difficult to evangelize Muslims from a fixed location because there are severe penalties under Islamic law for converting to Christianity . . . . The Muslims who do approach us will inevitably be watched by family, neighbors, and friends, subjecting them to possible ridicule, scorn, and punishment.  As a result, Muslims who are interested in Christianity are typically not willing to go to and be seen at a location that is known to be occupied by Christian evangelists, such as ACP.  I have personally experienced this in the past, and I experienced this at the 2009 Festival.

> 40.    In order to reach our intended audience—Muslims who we want to convert to Christianity—with our religious message, it is essential for us to be able to distribute our religious materials while walking on the public sidewalks where the exchange between the Christian brother or sister and the person he or she is evangelizing is more personal and confidential.  This allows the person receiving the religious materials to do so discretely and to read or view the materials in private at a later time without being exposed to ridicule, scorn, or punishment, which is likely if the individual was seen receiving materials at a Christian "booth."  In fact, it is not uncommon for a Muslim woman to take the Christian materials and hide them under her burqa for fear that her husband will see her with them.  I have experienced this many times myself.

*Id*. ¶¶ 39-40.  *See also* Saieg Dep. at 75-76.[9]

When permitted to freely roam the sidewalks at Festivals prior to 2009, ACP members

distributed approximately 37,000 and 20,000 packets of religious materials at the 2007 and 2008

---

[9] In short, Plaintiff states that he wishes to reach Muslims who have "been [held] captive in their countries for years," who have previously "not [been] allowed to hear about Jesus Christ"; in other words, "the people that are afraid to walk to a Christian booth."  Saieg Dep. at 96.

Festivals, respectively.  *Id.* ¶ 41.  At the 2009 Festival, by contrast, ACP members were only able

to distribute approximately 500 packets of religious materials from their fixed location.  *Id.*; Saieg

Dep. at 101-102.  Thus, the speech restriction placed on ACP members at the 2009 Festival

"severely limited [their] ability to distribute [their] religious materials" and consequently, ACP had

to seek storage space for the leftover materials.  Saieg Aff. ¶ 42; Pl. Ex. 1L (photograph of storage

space).  *See also* Saieg Dep. at 92 (explaining that "a lot less" people approached ACP members at

the 2009 Festival compared to prior years).

> ACP members wish to
>
>> visit the City during the 2010 Festival to distribute [their] religious materials
>> on the public streets and sidewalks adjacent to and surrounding the Festival.
>> However, because [they] are subject to arrest by City police officers for
>> engaging in [their] peaceful speech activity in the City, [they] are deterred
>> from doing so.

*Id.* ¶ 45.  *See also* Saieg Dep. at 66.

### III.  SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(b), a party against whom a claim is asserted may "at any time,

move with or without supporting affidavits, for a summary judgment in the party's favor as to all

or any part thereof."  Summary judgment is appropriate where the moving party demonstrates that

there is no genuine issue of material fact as to the existence of an essential element of the

nonmoving party's case on which the nonmoving party would bear the burden of proof at trial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "Of course, [the moving party] always bears

the initial responsibility of informing the district court of the basis for its motion, and identifying

those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of

material fact." *Id*. at 323.

A fact is "material" for purposes of a motion for summary judgment where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (quoting Black's Law Dictionary 881 (6th ed. 1979)) (citations omitted). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986). Conversely, where a reasonable jury could not find for the nonmoving party, there is no genuine issue of material fact for trial. *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir. 1993). In making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party. *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-1211 (6th Cir. 1984).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322-323. The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). The rule requires the non-moving party to introduce evidence of evidentiary quality" demonstrating the existence of a material fact. *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997).

## IV.  ANALYSIS - FREEDOM OF SPEECH (COUNT I)

17

Defendants argue, as Judge Edmunds found in her ruling on June 18, 2009, that the City's ban on handbilling in both the inner and outer perimeters of the Festival constitutes a valid time, place, and manner restriction under *Heffron* and *Spingola*.  Additionally, Defendants argue that the Amended Complaint should be dismissed under Fed. R. Civ. P. 12(b)(7) for failure to join the AACC, a purported necessary party under Fed. R. Civ. P. 19.

Plaintiff, on the other hand, contends that (1) this case is distinguishable from *Heffron* and *Spingola*, (2) Defendants may not, consistent with the First Amendment, ban handbilling on public streets and sidewalks, and (3) the ban is not a valid time, place, and manner restriction because it is impermissibly content-based and does not satisfy intermediate scrutiny.  Additionally, Plaintiff argues that dismissal of this case for failure to join a party is unwarranted.

The Court first addresses Defendants' joinder argument.  The Court then addresses whether the handbilling ban in the inner and outer perimeters is a valid time, place, and manner restriction under the First Amendment.

### A.  Should the Case be Dismissed for Failure to Join a Party?

Defendants urge the Court to dismiss this case under Fed. R. Civ. P. 12(b)(7) because Plaintiff failed to name the AACC as a party defendant.  According to Defendants, the AACC is a necessary party defendant because "even if . . . Plaintiff is successful against . . . Defendants, it would not change the rules of the Festival that require Plaintiff to . . . limit materials distribution to a fixed location."  Def. Br. at 14.  For this reason, Defendants contend that "complete relief" could not be granted to Plaintiff unless the AACC is a party.

Defendants' argument is unpersuasive because it ignores two crucial facts.  First, even if he wanted to, Plaintiff probably could not sue the AACC, a private organization, for First Amendment

violations.  *See Hudgens v. Nat'l Labor Relations Bd.*, 424 U.S. 507, 513 (1976) ("[i]t is, of course, a commonplace that the constitutional guarantee of free speech is a guarantee only against abridgment by government, federal or state").  *But see also Lansing v. City of Memphis*, 202 F.3d 821, 828 (6th Cir. 2000) ("a private entity can be held to constitutional standards when its actions so approximate state action that they may be fairly attributed to the state").

Second, and more importantly, the City—and not the AACC—is the proper party defendant in this case because it is the City's police officers who will be enforcing an "across the board" ban on all handbilling (except for handbilling occurring from assigned booths).  As mentioned above in Section II(E), there is no written AACC-promulgated rule prohibiting religious handbilling.  The AACC-promulgated rules prohibit only "solicitation" (which, according to Beydoun, is meant to cover distribution of handbills of a commercial nature) and "political solicitation."  Plaintiff's religious literature does not qualify under either of these two banned categories.  However, notwithstanding the lack of a written AACC-promulgated rule banning all handbilling, Dearborn Police Chief Haddad testified that he and his officers will be enforcing an "across the board" ban on all handbilling at the Festival (except handbilling from a assigned booths).  Haddad Dep. at 18, 70, 76, 95.  Haddad also testified that an individual handing out materials at the Festival in violation of the ban would be subject to possible arrest.  *Id.* at 72.  Plaintiff seeks an order preventing the City from enforcing, via threat of arrest, what he contends to be an unconstitutional speech restriction. *See* Saieg Aff. ¶ 44 ("[m]y fellow Christians and I . . . . intend to, visit the City during the 2010 Festival to distribute our religious materials . . . . However, because we are subject to arrest by City police officers for engaging in this . . . speech activity in the City, we are deterred from doing so"). Because Plaintiff seeks to enjoin Dearborn police officers from enforcing what is alleged to be an

unconstitutional speech restriction, the City and its Police Chief are the proper party defendants.

Defendants' joinder argument is unpersuasive.

### B. Is the Handbilling Ban a Valid Time, Place, and Manner Restriction?

### 1. The First Amendment, Generally

The First Amendment—which applies to the states through the Fourteenth Amendment, *see Murdock v. Commonwealth of Pa.*, 319 U.S. 105, 108 (1943)—declares, in relevant part: "Congress shall make no law . . . abridging the freedom of speech."  U.S. Const. amend I.  As stated by the Sixth Circuit,

> [g]overnmental restrictions on the content of speech pose a high risk that the government really seeks to suppress unwelcome ideas rather than achieve legitimate objectives.  As a general rule, therefore, the government cannot inhibit, suppress, or impose differential content-based burdens on speech. Nevertheless, courts will uphold such a regulation if necessary to serve a compelling state interest and it is narrowly tailored to the achievement of that end.

*Spingola*, 39 F. App'x at 982 (citations omitted).  "[T]he First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Heffron*, 452 U.S. at 647.

> Laws that do not regulate speech *per se*, but, rather, restrict the time, place and manner in which expression may occur are treated differently.  Such laws burden speech only incidentally, for reasons unrelated to the speech's content or the speaker's viewpoint.  In considering such content-neutral, time, place and manner restrictions, the Supreme Court employs "intermediate scrutiny," upholding limitations on the time, place, and manner of protected expression as long as "they are justified without reference to the content of the regulated speech, . . . are narrowly tailored to serve a significant governmental interest, and . . . leave open ample alternative channels for communication of the information."

*Spingola*, 39 F. App'x at 982 (citation omitted) (emphasis in original).  Thus, time, place, and manner restrictions are valid so long as they (1) are content-neutral, (2) are narrowly tailored, (3)

20

serve a significant governmental interest, and (4) leave open ample alternative channels for communication.

First of all, this Court reiterates that Plaintiff and his fellow missionaries will be able to mingle throughout the Festival and talk to people. Additionally, while circulating freely, they will be able to wear pins containing a message. The sole issue of contention is leafleting.

*Heffron* and *Spingola* both provide examples of speech restrictions that were upheld as valid time, place, and manner restrictions. In *Heffron*, the Supreme Court upheld a regulation on speech at the Minnesota State Fair, which was held on a 125-acre tract of state-owned land, that prohibited the distribution of literature or the soliciting of funds except at a rented booth. 452 U.S. at 643, 656. The Court held that the regulation was content-neutral because it "applie[d] evenhandedly to all who wish to distribute and sell written materials or to solicit funds" regardless of the speaker, viewpoint, or subject matter. *Id*. at 648-649. The Court also accepted the State's argument that the regulation was justified by a substantial state interest: protecting the "safety and convenience" of the fair-goers and ensuring the orderly flow of pedestrian traffic through the crowded fairgrounds. *Id*. at 650. Relatedly, the Supreme Court held that "consideration of a forum's special attributes is relevant to the constitutionality of a regulation since the significance of the governmental interest must be assessed in the light of the characteristic nature and function of the particular forum involved." *Id*. at 650-651. As stated by the Court,

> there are significant differences between a street and the fairgrounds. A street is continually open, often uncongested, and constitutes not only a necessary conduit in the daily affairs of a locality's citizens, but also a place where people may enjoy the open air or the company of friends and neighbors in a relaxed environment. The Minnesota Fair, as described above, is a temporary event attracting great numbers of visitors who come to the event for a short period to see and experience the host of exhibits and attractions at the Fair. The flow of the crowd and demands of safety are

21

> more pressing in the context of the Fair. As such, any comparisons to public
> streets are necessarily inexact.

*Id*. at 651. Finally, the Court held that the regulation left open ample alternative means for the communication of information because (1) the rule did not prevent members of the religious sect who brought the case, the Krishna, from practicing their religion outside the fairgrounds and (2) the rule did not prevent Krishna members from mingling with the crowd, orally propagating their views, or arranging for a booth to distribute and sell their religious literature. *Id*. at 654-655.

In *Spingola*, the Sixth Circuit upheld an ordinance requiring anyone engaged in public speaking during a town assemblage to speak from a designated "public speaking area." 39 F. App'x at 979. The assemblage at issue was a street fair, drawing thousands of people over a two-block area comprised of public streets. *Id*. at 978. There was no dispute in *Spingola* that the ordinance was content-neutral. *Id*. at 983. Relying heavily on *Heffron*, the court found that the fair area, "though comprised of public streets, [was] not serving in that function during the festival." *Id*. at 983. The court also held, citing *Heffron*, that the ordinance served the important governmental purposes of increasing public safety during the festival, ensuring smoother traffic flow, and balancing free speech with the rights of persons attending the festival to be free from hindrance. *Id*. at 984. Moreover, alternative channels for speech existed because the ordinance called for a designated speaking area and the plaintiff, a "confrontational evangelist," could stand outside the festival grounds if he chose. *Id*. at 984-985.

In the instant case, the Court concludes that the site at issue is in reality a fairgrounds.

### 2. The Parties' Arguments

The crucial question in this case is whether the "across the board" ban on mobile handbilling in the inner and outer perimeters of the Festival, which was enforced at the 2009 Festival and will

again be enforced at the upcoming 2010 Festival, *see* Haddad Dep. at 18, 70, 72, 76, 95, qualifies as a valid time, place, and manner restriction.[10]

Plaintiff makes several arguments.  First, he broadly contends that Defendants may not, consistent with the First Amendment, ban handbilling on public streets and sidewalks.  Second, he argues that the handbilling ban does not qualify as a valid time, place, and manner restriction.  In so arguing, Plaintiff attacks each of the four required elements of a valid time, place, and manner restriction;  specifically, he contends that the handbilling ban (1) does not leave open ample alternative channels for communication, (2) is content-based, (3) does not serve a significant governmental interest, (4) is not narrowly tailored.

Defendants disagree with Plaintiff on each point.  According to Defendants, they may regulate handbilling on public streets and sidewalks and the restriction at issue here—the "across

_____

[10] The Court takes this opportunity to clarify precisely what rule/regulation is being subjected to constitutional scrutiny in this case.  Again, as discussed above, there is no written rule promulgated by the AACC banning all handbilling at the Festival.  Instead, the written Festival rules ban "solicitation," which, according to Beydoun, covers commercial handbilling only, and "political solicitation."  These written rules are not at issue in this case because they are rules that are promulgated by a private organization and Dearborn Police Chief Haddad has never indicated that he and his officers will be enforcing them.  Instead, Haddad indicated that he and his officers will be enforcing an "across the board" ban on all types of handbilling at the Festival, except for handbilling that occurs at designed booths.  It is this "across the board" ban about which Plaintiff complains; it is therefore the "across the board," police enforced ban that is the subject of constitutional scrutiny.

Thus, the City has vowed to enforce a broad ban on handbilling in both the inner and outer perimeters of the Festival, except for handbilling from a designated booth/table.  Plaintiff complains about this police-enforced ban and, because Dearborn police officers did (in 2009), and will (in 2010), enforce it, the First Amendment applies.

The Court finds that the public streets on which the Festival is held are "not serving in that function during the festival" *see Spingola*, 39 F. App'x at 983, rather, they comprise part of a fairground.

23

the board" ban on handbilling in the inner and outer perimeters—constitutes a valid time, place, and manner restriction.

### 3. Discussion

Before addressing Plaintiff's arguments, the Court first notes that the speech at issue in this case is undisputably protected by the First Amendment. *See Murdock*, 319 U.S. at 110 ("spreading one's religious beliefs or preaching the Gospel through distribution of religious literature and through personal visitations is an age-old type of evangelism with as high a claim to constitutional protection as the more orthodox types [of religious practices]").

Plaintiff first argues that because the Festival grounds are comprised of public streets and sidewalks, Defendants may not, consistent with the First Amendment, ban handbilling on public streets and sidewalks. In so arguing, Plaintiff emphasizes in his brief that public streets are traditional public fora and are thus "held in public trust," *Frisby v. Schultz*, 487 U.S. 474, 481 (1988), as "proper places for the dissemination of information and opinion." *Schneider v. State of N.J., Town of Irvington*, 308 U.S. 147, 151 (1939). While this is a component of the relevant First Amendment analysis, Plaintiff does not acknowledge that the Festival grounds here are analogous to those in *Spingola* inasmuch as both festival grounds are comprised of public streets that, in the words of the *Spingola* court, are "not serving in that function during the festival." *See* 39 F. App'x at 983. As such, Plaintiff's reliance on cases such as *Jamison v. State of Tex.*, 318 U.S. 413 (1943), *Martin v. City of Struthers*, 319 U.S. 141 (1943), and *Lovell v. City of Griffin*, 303 U.S. 444 (1938)—all of which involve the enforcement of speech restrictions on streets and sidewalks that are serving in their ordinary function as open streets and sidewalks—is misplaced. This is because "[t]he flow of the crowd and demands of safety are more pressing in the context of [a] [f]air" and

24

"[a]s such, any comparisons to public streets are necessarily inexact." *Heffron*, 452 U.S. at 541.

Additionally, Plaintiff also fails to acknowledge that speech—even if taking place in a traditional public forum—is subject to valid time, place, and manner restrictions. *See Spingola*, 39 F. App'x at 983 ("regardless of whether we would classify the . . . festival area as a traditional public forum or a limited public forum . . . , the Ordinance is examined under the same intermediate level of scrutiny"). Therefore, the argument that Defendants may not regulate speech on public streets and sidewalks is unpersuasive.

Plaintiff's main argument is that the handbilling ban in the inner and outer perimeters of the Festival does not constitute a valid time, place, and manner restriction. Specifically, Plaintiff contends that the handbilling ban (1) does not leave open ample alternative channels for communication, (2) is content-based, (3) does not serve a significant governmental interest, (4) is not narrowly tailored. The Court addresses each of these requirements, in turn, below. Ultimately, the Court concludes that the ban on handbilling in the inner and outer perimeters qualifies as a valid time, place, and manner restriction.

### a. Does the Handbilling Ban Leave Open Alternative Channels for Communication?

Plaintiff argues that

> by banning the distribution of religious literature on the sidewalk and in other public areas and forcing Plaintiff to a fixed location, Defendants' restriction does not leave open ample alternative means of communication, and it prevents Plaintiff from reaching his intended audience in violation of the Constitution.

Pl. Br. at 18-19. *Heffron* and *Spingola* preclude Plaintiff's argument. The speech restriction at issue in *Heffron* prohibited the distribution of literature or the soliciting of funds at the Minnesota State Fair except at a rented booth. The Supreme Court found that the restriction left open ample

alternative means for the communication of information because (1) the regulation did not prevent Krishna members from practicing their religion outside the fairgrounds and (2) the regulation did not prevent Krishna members from mingling with the crowd, orally propagating their views, or arranging for a booth to distribute and sell their religious literature. *See* 452 U.S. at 654-655.

Similarly, in *Spingola*, the Sixth Circuit held that alternative channels for speech existed because the ordinance, which required anyone engaged in public speaking during a town assemblage to speak from a designated "public speaking area," called for a designated speaking area and the plaintiff, a "confrontational evangelist," could stand outside the festival grounds if he chose. *See* 39 F. App'x at 985-985.

So too, the instant case. There is no allegation that Plaintiff missionaries were in anyway prohibited or discouraged from distributing their religious literature outside the Festival boundaries. Nor does Plaintiff allege that then-ACP members were prevented from mingling with the Festival crowd and orally propagating their religious views; Plaintiff and his associates were only prevented from distributing literature outside of their designated booth. Finally, then-ACP members could—and did at the 2009 Festival—utilize a booth to distribute their religious literature.[11] They will be permitted to do the same at the 2010 Festival.[12] This year, Plaintiff will receive a booth, free of charge, with electricity to facilitate evening activities, and a location closer to the center of the Festival.

Plaintiff and his fellow missionaries have never been denied access to the Festival forum,

---

[11] As noted in the background section, the AACC waived Plaintiff's rental fee.

[12] During oral argument, counsel for Defendants indicated that the AACC would waive Plaintiff's rental fee, as it did last year.

nor have they been denied the opportunity to interact with their intended audience, Festival-goers. Thus, the case upon which Plaintiff relies—*Bay Area Peace Navy v. United States*, 914 F.2d 1224, 1229-1230 (9th Cir. 1990), where the speech restriction in question prevented the plaintiff from reaching its intended audience with its message—is inapposite.  In short, the very same alternative avenues of communication are available to Plaintiff in this case as were available to the respective plaintiffs in both *Heffron* and *Spingola*.  These alternative avenues were deemed constitutionally adequate by the Supreme Court and the Sixth Circuit in *Heffron* and *Spingola*, respectively; they are constitutionally adequate here, as well.

The Court acknowledges Plaintiff's complaint that "[p]eople appeared unwilling to approach [the booth] location at night" because their tent was not equipped with electricity, *see* Saieg Aff. ¶ 36, and the tent was not ideally located because it was near the children's area.  *Id*. ¶ 38.  This year, the tent is equipped with electricity, and the location is not in the children's area, but instead in the central area.

The Constitution does not guarantee a person "her best means of communication." *Phelps-Roper v. Strickland*, 539 F.3d 356, 372 (6th Cir. 2008) (citing *Heffron*, 452 U.S. at 647 ("the First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired")).  *See also Prime Media, Inc. v. City of Franklin, Tenn.*, 181 F. App'x 536, 541 (6th Cir. 2006) (unpublished) ("alternative channels of communication need not be available at every location, or at the most desirable location, within a city").  Plaintiff and his fellow missionaries will not be denied access to the Festival forum, nor denied the opportunity to interact with their intended audience.  Under these circumstances, notwithstanding Plaintiff's complaints, alternative channels for communication of their message remained sufficiently open.

*See Heffron*, 452 U.S. at 654-655; *Spingola*, 39 F. App'x at 985-985.

### b. Is the Handbilling Ban Content-Neutral?

"[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92, 95 (1972). Thus,

> [g]overnment action that stifles speech on account of its message . . . contravenes this essential [First Amendment] right. Laws of this sort pose the inherent risk that the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas or information or manipulate the public debate through coercion rather than persuasion.

*Turner Broad. Sys., Inc. v. Fed. Commc'n Comm'n*, 512 U.S. 622, 641 (1994). For this reason, content-based regulations are subject to "the most exacting scrutiny," *id.* at 642, and are "presumptively invalid." *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 382 (1992).

Plaintiff argues that the ban on handbilling is content-based and therefore subject to strict scrutiny. Plaintiff believes that the ban favors commercial speech in violation of the First Amendment because it permits local businesses along Warren Avenue, and no one else, to set up sidewalk sales immediately outside their respective storefronts.[13] Plaintiff relies mainly upon the following three cases in support of his argument, all of which hold that the government cannot favor commercial speech over non-commercial speech, or vice-versa: *S.O.C., Inc. v. County of Clark*, 152 F.3d 1136, 1145 (9th Cir. 1998) (invalidating as content-based an ordinance that prohibited the distribution of handbills that contain commercial advertising while allowing the distribution of handbills that did not contain commercial advertising); *Metromedia, Inc. v. City of San Diego*, 453

---

[13] Plaintiff also argues that the ban violates his Fourteenth Amendment right to equal protection for the same reason.

U.S. 490, 513 (1981) (White, J., plurality opinion) (invalidating as content-based a city ordinance that, among other things, favored commercial advertisements on billboards over non-commercial advertisements); *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429 (1993) (invalidating as content-based a city regulation banning newsracks that distributed commercial handbills but not newsracks that distributed newspapers). The regulations in each of these cases were invalidated essentially because, in the words of the Ninth Circuit, "an officer who seeks to enforce the [regulation] would need to examine the contents of the handbill to determine whether its distribution was prohibited." *See S.O.C., Inc.*, 152 F.3d at 1145.

Defendants, on the other hand, argue that the ban on handbilling is content-neutral:

> Plaintiff has taken great pains to argue that distinctions have been made between commercial and non-commercial speech, but the evidence clearly demonstrates that no such content-based decisions were made. First and foremost, . . . the sidewalks were not functioning as sidewalks, but instead were incorporated in to the Festival grounds, and the [AACC] was granted the same control over the sidewalks that it had over the streets during the Festival. Beydoun explained, "we don't allow just anybody to come and set up, and they're not allowed to decide where they want to set up. We have specific areas for specific things." (Beydoun dep., at 33.) For example, there were numerous themed tents – one for food vendors, one for artists, and one for children's activities. (Exhibit D.) The Warren Avenue businesses effectively constitute their own themed area of the Festival, and they are able to take advantage of their location by setting up in front of their business, when logically feasible. (Beydoun dep., p. 36.)

Resp. Br. at 21.

Defendants' position is persuasive. One of the stated purposes of the Festival is to "promote the Warren Avenue Business District." Def. Ex. E, p. 3. Thus, the AACC affords anyone who occupies existing store space along Warren Avenue, subject to logistical concerns, the opportunity

to utilize the sidewalk in front of their store during the Festival.[14]  As Defendants note, and the Court agrees, "[t]he Warren Avenue businesses effectively constitute their own themed area of the Festival, and they are able to take advantage of their location by setting up in front of their business, when logically feasible."

To the extent that Defendants enforce the AACC's rule permitting occupants of space along Warren Avenue to set up on the sidewalk outside their storefronts at the exclusion of those who do not occupy space along Warren Avenue, the restriction is not content-based because no expression is being restricted based on "its message, its ideas, its subject matter, or its content."  *See Mosley*, 408 U.S. at 95.  Rather, Defendants, by enforcing the AACC's rule, are favoring, if anyone, those with space along Warren Avenue no matter who they are or what their message.  In reality, this is a quid pro quo for stores negatively impacted by the Festival.  In exchange for subjecting them to Festival crowds in front of their stores and closed-off streets that block regular customers' ingress and egress, the existing merchants are permitted to set up tables out front to sell their wares.  Thus, if ACP had an existing office located in the inner perimeter along Warren Avenue, there is nothing

---

[14] Beydoun testified that only businesses along Warren Avenue were permitted to be sidewalk vendors:

> Q:   Is there anybody other than the businesses [along Warren Avenue] who were the sidewalk vendors?
>
> * * * *
>
> A:   No.
>
> Q:   So the sidewalk vendors are essentially the businesses along Warren Avenue?
>
> A:   That is correct.

Beydoun Dep. at 64-65.

in the record to suggest that it could not set up a table outside its office like everyone else occupying

space along Warren Avenue.  In other words, there is nothing to suggest that the criterion to set up

a sidewalk sale along Warren Avenue has anything to do with the message of the occupant, or the

subject matter of the occupant's speech (i.e., commercial versus non-commercial); rather, the

criterion is that the occupant simply occupy space in the inner perimeter along Warren Avenue.  *See*

Beydoun Dep. at 65 (testifying that the sidewalk vendors along Warren Avenue are Warren Avenue

businesses).   Because Defendants are not enforcing a restriction on expression that favors

commercial speech over non-commercial speech, the cases cited by Plaintiff, discussed above, are

not controlling.[15]

### c.  Does the Handbilling Ban Serve a Substantial Governmental Interest?

In *Heffron*, the Supreme Court held that the government's interest in ensuring the orderly

flow of pedestrian traffic through a crowded fairgrounds constitutes a substantial governmental

interest.  *See* 452 U.S. at 650.  The Sixth Circuit, in *Spingola*, held the same.  *See* 39 F. App'x at

984.  Indeed, Judge Edmunds also held the same in the instant case, in denying Plaintiff's request

for a temporary restraining order last year.

Defendants argue that the holdings in *Heffron* and *Spingola* apply with equal force here

because the goals underlying the handbilling ban are the same as those proffered by the governments

---

[15] For the same reason, Plaintiff's equal protection claim fails.  The case upon which Plaintiff relies in support of his equal protection claim, *Mosley*, is inapplicable.  In *Mosley*, the Supreme Court held that a city ordinance prohibiting all picketing within 150 feet of a school, except peaceful picketing of any school involved in a labor dispute, violated the Equal Protection Clause because it makes an impermissible distinction between peaceful labor picketing and other peaceful picketing.  *Id.* at 94.  Here, on the other hand, as explained, occupants along Warren Avenue are conferred the right to conduct sidewalk sales during the Festival because of their location alone, not because of a message, idea, or subject matter of speech espoused by the occupant.

in both *Heffron* and *Spingola*.  Plaintiff, on the other hand, argues that the holdings are inapplicable here for two reasons.  First, Plaintiff points out that the fairgrounds in *Heffron* were not located on public streets and sidewalks as are the Festival grounds here.  Thus, as Plaintiff notes, "the fair [in *Heffron*] occurred at a closed, fixed location entirely dedicated for that purpose—there was no ongoing business activity on the fairgrounds nor pedestrian traffic moving through that was unrelated to the fair." Pl. Br. at 19.  Plaintiff contends that *Heffron* is inapplicable here based on this distinction.  In *Heffron*, everyone on the fairgrounds was there for the fair; here, because the Festival takes place on public streets that are lined with stores that are open to Festival-goers and non-Festival-goers alike, not everyone at the Festival, presumably, was there for the Festival – some were there for matters unrelated to the Festival.

This argument is foreclosed by *Spingola*.  The fair at issue in *Spingola* took place over a two-block area comprised of public streets in the Village of Granville.  *See* 39 F. App'x at 978.  Thus, in upholding the public speaking ban at issue in *Spingola* as a valid time, place, and manner restriction, the Sixth Circuit applied the *Heffron* holding to a venue, like the one here, that was comprised of public streets and was open to pedestrian traffic unrelated to the fair.

Plaintiff's second argument as to why *Heffron* does not apply here is also unpersuasive. Plaintiff argues that the presence of some Festival activities on the sidewalk along Warren Avenue frustrates the government's stated goal of ensuring the orderly flow of pedestrian traffic through the crowded Festival.  As stated by Plaintiff, "it makes little sense to permit businesses to set up fixed locations that plainly block the public sidewalks and then prohibit individuals from distributing noncommercial, religious literature in the same forum." Pl. Br. at 17.  However, a similar argument was made by the plaintiff, and rejected by the Sixth Circuit, in *Spingola*:

> Spingola argues that the [public speaking] regulation does not relieve the crowding and pedestrian flow obstructions that take place during the festival regardless.  That, however, is not the question.  The question is whether preventing uncontrolled public speaking in these areas promotes a significant governmental interest that would be less effectively achieved without the law.  That is accomplished by providing a smoother flow of traffic within the festival crowd.

39 F. App'x at 984.  Accordingly, Plaintiff's second argument, like his first one, is foreclosed by *Spingola*.

Based on the Supreme Court's holding in *Heffron* and the Sixth Circuit's holding in *Spingola*, Defendants' proffered justifications for the handbilling ban—maintaining crowd control, relieving pedestrian congestion, and ensuring an orderly Festival—constitute substantial governmental interests.

### d. Is the Handbilling Ban Narrowly Tailored to Serve the City's Substantial Governmental Interests?

As stated by the Sixth Circuit,

> time, place, and manner regulations of speech must be narrowly tailored to serve the government's legitimate, content-neutral interests.  Narrow tailoring means that the "[g]overnment may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals," but it does not require that the means chosen "be the least restrictive or least intrusive means" of serving its goals.  "Rather, the requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation."

*Richland Bookmart, Inc. v. Knox County, Tenn.*, 555 F.3d 512, 528 (6th Cir. 2009) (citations omitted).  For example, in *United States v. Grace*, 461 U.S. 171 (1983), a case upon which Plaintiff heavily relies, the Supreme Court declared unconstitutional a broad restriction on speech on the public sidewalks surrounding the Supreme Court's building.  The regulation banned, in part, the display of "any flag, banner, or device designed . . . to bring into public notice any party,

33

organization, or movement." *Id*. at 175.  The purpose of the regulation was to "provide for the protection of the [Supreme Court] building and grounds and of the persons and property therein, as well as the maintenance of proper order and decorum." *Id*. at 182.  The Court found that the regulation was not a valid time, place, and manner restriction "because it ha[d] an insufficient nexus with any of the public interests that may be thought to undergrid [it]." *Id*. at 181.  In other words, the regulation did "not sufficiently serve those public interests that [were] urged as its justification." *Id.  See also Nat'l Ass'n for Advancement of Colored People v. Button*, 371 U.S. 415, 438 (1963) ("[b]road prophylactic rules in the area of free expression are suspect.  Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms").

Plaintiff argues that the City's goals of maintaining crowd control, relieving pedestrian congestion, and ensuring an orderly Festival are not furthered by prohibiting handbilling in the outer perimeter.  This is because the outer perimeter is not crowded with wall-to-wall people as is the inner perimeter, which serves as the actual Festival grounds.  As stated by Plaintiff,

> Defendants do not limit their speech restriction to the public sidewalks immediately adjacent to where the Festival activities are taking place on Warren Avenue and Miller Road.  Instead, they created a broad, prophylactic prohibition on the distribution of literature that extends beyond the actual Festival grounds to include more than 30 surrounding City blocks ("outer perimeter").  Consequently, the City has created a "First-Amendment-free-zone" that has little to no connection with the Festival.

Pl. Br. at 17 (footnote omitted).  Via this argument, then, Plaintiff is challenging the handbilling ban in the outer perimeter only, asserting that the ban is not narrowly tailored to alleviate the City's crowd control concerns since those concerns are not implicated in the uncrowded outer perimeter.  Plaintiff does not mount a "narrow tailoring" challenge with respect to the enforcement of the handbilling ban in the inner perimeter.  For the reasons that follow, the Court rejects Plaintiff's

argument and finds that the ban on handbilling in the outer perimeter is narrowly tailored to serve the City's legitimate and substantial interest in ensuring an orderly Festival.

The outer perimeter runs approximately five blocks to the west of the western edge of the inner perimeter, covering the following blocks: Rueter Avenue, Jonathon Street, Bingham Street, Calhoun Street, and Schaefer Highway. The outer perimeter runs approximately four blocks to the east of eastern edge of the inner perimeter, covering the following blocks: Emanon Street, Freda Street, Normile Street, and Wyoming Avenue.[16]

The stated purpose of the outer perimeter is to "provid[e] a safe, controllable buffer between the bulk of the Festival activities and the outside world" in order "[t]o ensure an orderly and safe transition from the open streets and the streets occupied by the Festival." Def. Br. at 3-4. *See* Mrowka Dep. at 15 (testifying that the purpose of the outer perimeter is to "restrict traffic and crowd control into the festival area"). There is no dispute that this constitutes a substantial interest under *Heffron*. *See* 452 U.S. at 650 ("it is clear that a State's interest in protecting the 'safety and convenience' of persons using a public forum is a valid governmental objective"). Rather, the dispute is whether a handbilling prohibition in the outer perimeter is narrowly tailored to serve the City's interest. The Court finds that it is.

It is crucial to note that this case is not just about Plaintiff's right to exercise his First Amendment rights in the outer perimeter; it is about the right of everyone to do so. That is, if the Court struck down the ban as unconstitutional, everyone—not just Plaintiff and his associates—would be permitted to distribute literature in the outer perimeter. Organizations of all

_____

[16] Plaintiff's briefs contain repeated references to an outer perimeter that is "30 blocks" in size. This description is misleading because, as discussed, the outer perimeter runs only one block to the north and south of the inner perimeter and five and four blocks, respectively, to the west and east of the inner perimeter.

kinds, businesses, and individuals alike would all flock to the outer perimeter to promote their respective interests and messages. The consequence of this would be to effectively extend the Festival grounds into an area that is meant to serve as a buffer zone between the Festival and the outside world. This result would undermine the legitimate and substantial interest of the City to "ensure an orderly and safe transition from the open streets and the streets occupied by the Festival." It is for this reason that a ban on handbilling in the outer perimeter is narrowly tailored. A result to the contrary would severely undercut the City's substantial interest in maintaining a safe zone, clear of wall-to-wall Festival crowds, between the Festival grounds and the outside world.

It is also for this reason that the Court finds the Supreme Court's decision in *Grace* inapplicable here. In *Grace*, the ban on certain communicative activity on the public sidewalks surrounding the Supreme Court building did not sufficiently serve the government's interest in protecting the Supreme Court grounds and maintaining proper order and decorum. There was an "insufficient nexus" between the ban and the public interests undergridding it. In other words, the *Grace* Court effectively held that the government could accomplish its goals, which were deemed to be substantial governmental interests, without imposing the ban. The same is not true here for the reasons stated in the preceding paragraph. Without a ban on the distribution of literature in the outer perimeter—which is meant to serve as a safe zone for three days out of the year—the City could not accomplish its goal.

The Court also finds *Grace* distinguishable because the ban in *Grace* applied to communicative activity taking place on sidewalks that were serving in their traditional function as sidewalks. *See Grace*, 461 U.S. at 179 ("[t]he sidewalks comprising the outer boundaries of the [Supreme] Court grounds are indistinguishable from any other sidewalks in Washington, D.C., and

we can discern no reason why they should be treated any differently"). The same is not true here. For three days out of the year, the streets and sidewalks of the outer perimeter are not serving as traditional streets and sidewalks; rather, they are serving in an entirely different role. *See Heffron*, 452 U.S. 651 ("[t]he flow of the crowd and demands of safety are more pressing in the context of [a] Fair. As such, any comparisons to public streets are necessarily inexact"). For these reasons, *Grace* is not controlling here.

The Court analogizes the two perimeters to airport traffic; the inner perimeter is like the main runway, while the outer perimeter is like a taxiway which serves the purpose of unimpeded ramp up and ramp down of traffic speeds into the inner perimeter.

For the reasons stated above, the Court finds that the handbilling ban in the inner and outer perimeters meets the requirements for a valid time, place, and manner restriction on speech. Accordingly, summary judgment will be granted in favor of Defendants on Plaintiff's First Amendment free speech claim.

## V. ANALYSIS - FREEDOM OF ASSOCIATION (COUNT II)

Defendants argue that they are entitled to summary judgment in their favor on Plaintiff's freedom of association claim. Plaintiff does not seek summary judgment on this claim, and the claim is scarcely discussed in Plaintiff's motion papers, and not at all at oral argument.

In the Amended Complaint, Plaintiff states that "Defendants have deprived [him] of [his] right to expressive association guaranteed by the First Amendment" "[b]y reason of the [handbilling restriction]." Am. Compl. ¶ 78. In his response to Defendants' Motion for Summary Judgment, Plaintiff states that the handbilling ban forces Plaintiff "to be a participant in—and thus [a] supporter of—the Festival." Resp. at 9 (emphasis deleted).

This argument, although interesting, is unpersuasive.  Plaintiff relies solely upon *Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557 (1995), in support of his argument.  There, the Supreme Court held that the government cannot force private citizens who organize a parade to include among the marchers a group imparting a message that the organizers do not wish to convey.  *Id*. at 559.  Thus, the Court found that compelling the parade organizer to include the Irish-American Gay, Lesbian, and Bisexual Group in the parade "violates the fundamental rule . . . under the First Amendment, that a speaker has the autonomy to choose the content of his own message." *Id*. at 572.

The present case is not like *Hurley*.  *Hurley* involved a situation where the government was attempting to use its power to compel a private speaker, the parade organizer, to alter its message.  Here, the government is not forcing Plaintiff to do anything; Plaintiff, by his own choice, wishes to impart his religious message upon Festival-goers.  For this reason, *Hurley* is inapplicable.  Plaintiff's freedom of association claim is unavailing.

## VI.  ANALYSIS - FREE EXERCISE CLAIM (COUNT III)

Plaintiff does not discuss his free exercise claim in his motion papers despite the fact that the claim is discussed by Defendants.  Therefore, the claim is deemed abandoned.  *See Guarino v. Brookfield Twp. Trustees*, 980 F.2d 399, 405 (6th Cir. 1992) (if the non-moving party fails to carry its burden of setting forth specific facts showing genuine issues of fact for trial, "its opportunity is waived and its case wagered").

In any event, the claim is not viable.  As stated in a respected treatise,

> the free exercise clause is invoked in several situations.  One is when the
> government prohibits behavior that a person's religion requires. . . . The free
> exercise clause also is invoked when the government requires conduct that
> a person's religious prohibits. . . . Additionally, the free exercise clause is

invoked when individuals claim that laws burden or make more difficult religious observances.

E. Chemerinsky, *Constitutional Law* § 12.3.1, p. 1247 (3d ed. 2006). None of these situations appear to be implicated in this case; if one is, Plaintiff does not explain how. Accordingly, summary judgment will be granted in favor of Defendants on Plaintiff's free exercise claim.

## VII.  ANALYSIS - EQUAL PROTECTION CLAIM (COUNT IV)

Plaintiff's equal protection claim under the Fourteenth Amendment is not viable for the reasons stated in footnote 15, above.

## VIII.  ANALYSIS - MUNICIPAL LIABILITY

Although not the subject of a separate count, Plaintiff broadly asserts municipal liability against the City. Plaintiff contends that the City is liable under § 1983 because it enforced an unconstitutional speech restriction. In addition, Plaintiff alleges throughout his Amended Complaint and motion papers that the handbilling ban at the 2009 Festival was selectively enforced by Dearborn police officers. Although the parties do not explicitly acknowledge it as such, the selective enforcement claim constitutes a municipal liability claim.

Three general rules govern a municipal liability claim. First, "a municipality cannot be held liable [under § 1983] solely because it employs a tortfeasor–or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory." *Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658, 691 (1978). In other words,

> a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

*Id*. at 694. Second, "[a] local government entity violates § 1983 where its official policy or custom

39

actually serves to deprive an individual of his or her constitutional rights." *Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006).  Third, "[t]he burden of proof is on the plaintiff to set forth the unconstitutional policy and link it with both the municipality and the injuries at issue." *King v. City of Eastpointe*, 86 F. App'x 790, 801 (6th Cir. 2003) (unpublished).

The Supreme Court has explained why a plaintiff seeking to impose liability on a municipality under § 1983 must identify a municipal "policy" or "custom" that caused injury:

> Locating a "policy" ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality.  Similarly, an act performed pursuant to a "custom" that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law.

*Bd. of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 403-404 (1997) (citation omitted).  Put differently,

> [t]he requirement that a municipality's wrongful actions be a "policy" is not meant to distinguish isolated incidents from general rules of conduct promulgated by city officials.  It is meant to distinguish those injuries for which "the government as an entity is responsible under § 1983" from those injuries for which the government should not be held accountable.  "*Monell* is a case about responsibility."  "The 'official policy' requirement was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible."

*Meyers v. City of Cincinnati*, 14 F.3d 1115, 1117 (6th Cir. 1995) (citations omitted) (emphasis in original).

Because the Court has found that enforcement of the handbilling ban in the inner and outer perimeters is constitutional, Plaintiff cannot establish an unconstitutional policy or custom.  His municipal liability claim, therefore, is not viable.

With regard to Plaintiff's selective enforcement claim, the Third Circuit has stated that

> in order to establish municipal liability for selective enforcement of a facially viewpoint- and content-neutral regulation, a plaintiff whose evidence consists solely of the incidents of enforcement themselves must establish a pattern of enforcement activity evincing a governmental policy or custom of intentional discrimination on the basis of viewpoint or content.

*Brown v. City of Pittsburgh*, 586 F.3d 263, 294 (3d Cir. 2009). There is no policy of selective enforcement at issue in this case. Thus, in order to sustain his selective enforcement claim, Plaintiff must demonstrate a municipal custom of selective enforcement or, in the words of the Third Circuit, "a pattern of enforcement activity evincing a governmental . . . custom of intentional discrimination on the basis of viewpoint or content." *Brown*, 586 F.3d at 294.

Plaintiff testified that he observed Dearborn police officers selectively enforcing the handbilling ban at the 2009 Festival:

> 27.  During the 2009 Festival, the rules and regulations were selectively enforced. For example, various festival booths on Warren Avenue blocked parts of the sidewalk (Haddad deposition exhibit 14); ART (Arabic Radio & Television) had a booth at the Festival and was allowed to pass out flyers outside of the booth, even in front of the police and security guards; a "Monster" truck was allowed to pass out free drinks within the border areas to Festival goers; and a Five Star Video representative was permitted to distribute flyers to Festival goers in the street and on the sidewalks without first purchasing a booth. True and accurate photographs of these activities are attached to this declaration as Exhibit F.

> 28.  Even though my fellow Christians and I were prohibited from distributing our religious literature on the adjacent and surrounding public streets and sidewalks during the Festival, certain individuals unrelated to us and our Christian outreach were not so prohibited. In fact, some individuals were distributing literature within the Festival itself on Warren Avenue and the City police did not stop them. A true and accurate photograph of an individual distributing literature to me on Warren Avenue during the Festival (Haddad deposition exhibit 17) and a true and accurate photograph of an individual distributing literature to me on the public sidewalk adjacent to

> Warren Avenue during the Festival (Haddad deposition exhibit 18)
> are attached to this declaration as Exhibit G.  Additional true and
> accurate photographs of individuals distributing materials on the
> public sidewalks and on Warren Avenue during the 2009 Festival are
> attached to this declaration as Exhibit H.

Saieg Aff. ¶¶ 27-28.

Accepting Plaintiff's testimony as true and assuming that the pictures show what they are alleged to show, and taking the evidence in the light most favorable to Plaintiff, the testimony above is insufficient to establish a cognizable municipal liability claim based on selective enforcement. Plaintiff alleges the following instances of selective enforcement of the handbilling ban during the 2009 Festival: (1) Arabic Radio & Television was allowed to pass out flyers outside of its booth; (2) a "Monster" truck was allowed to pass out free drinks within the border areas to Festival-goers; (3) a Five Star Video representative was permitted to distribute flyers to Festival-goers in the street and on the sidewalks without first purchasing a booth; (4) "some individuals were distributing literature within the Festival itself on Warren Avenue and the City police did not stop them."

These four instances, even if true, do not amount to "a pattern of enforcement activity evincing a governmental . . . custom of intentional discrimination on the basis of viewpoint or content." *Brown*, 586 F.3d at 294.  This is because these instances, alone, are insufficient to show that selective enforcement of the handbilling ban was "so widespread as to have the force of law." *Brown*, 520 U.S. at 403-404.

In addition, Plaintiff has not demonstrated that "those whose edicts or acts may fairly be said to represent official policy," such as Chief Haddad, are responsible for the above-described instances of selective enforcement.  *See Monell*, 426 U.S. 694.  In other words, Plaintiff has not alleged that

the constitutional injury, selective enforcement of the handbilling ban, was inflicted by the City itself, through its decision-makers (i.e., Haddad), as opposed to one or more of its employees or agents (i.e., individual patrol officers). *See Monell*, 436 U.S. at 691 ("a municipality cannot be held liable under § 1983 on a respondeat superior theory").  For these reasons, Plaintiff's selective enforcement claim is not viable under § 1983.

## IX.  QUALIFIED IMMUNITY

Haddad mistakenly argues that he is entitled to qualified immunity.  This is not an action for monetary relief; it is an action for declaratory and injunctive relief.  Moreover, Haddad is sued in his official capacity only.  "Qualified immunity is an affirmative defense to damage liability; it does not bar actions for declaratory or injunctive relief. *Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 527 (9th Cir. 1989).  Moreover, "[q]ualified immunity shields [a] defendant from personal liability, but it does not shield him from . . . claims brought against him in his official capacity." *Hall v. Tollett*, 128 F.3d 418, 430 (6th Cir. 1997).  Accordingly, Haddad is not entitled to qualified immunity.

## X.  ORDER

For the reasons stated, Defendants' Motion for Summary Judgment is granted.  Plaintiff's Motion for Summary Judgment and Request for Injunctive Relief is denied.  All other outstanding motions are denied as moot.  This case is dismissed.

SO ORDERED.


s/Paul D. Borman                                        
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

43

Dated:  June 7, 2010

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on June 7, 2010.


s/Denise Goodine
Case Manager